[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 85 
On August 16, 2000, Davida Crutcher, a minor, proceeding by and through her next friends Leon Gaines and Rebecca Gaines, her grandparents, sued her former employer Wendy's of North Alabama, Inc. ("Wendy's"), a corporation owning several Wendy's fast-food restaurant franchises in north Alabama. Crutcher's complaint presented claims of false imprisonment, slander, and invasion of privacy arising out of her employment at a Wendy's restaurant in Huntsville ("the restaurant").
Wendy's filed a motion for a summary judgment, along with supporting evidentiary materials. On April 23, 2002, after other filings by the parties, the trial court entered a summary judgment in favor of Wendy's on all of Crutcher's claims.
Crutcher then filed this appeal; the trial court subsequently granted her motion to supplement and correct the record on appeal. Crutcher presents 18 issues to be considered by this Court, 17 of which essentially contend that the summary judgment must be reversed because, she says, genuine issues of material fact exist. In the eighteenth issue, Crutcher contends that the trial court's summary-judgment order was erroneous because it was prepared by counsel for Wendy's.
Our review of a summary judgment is de novo.
 "In reviewing the disposition of a motion for summary judgment, `we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988), and whether the movant was `entitled to a judgment as a matter of law.' Wright v. Wright, 654 So.2d 542 (Ala. 1995); Rule 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala. 1993) [overruled on other grounds, Bruce v. Cole, 854 So.2d 47 (Ala. 2003)]; Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala. 1990)."
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala. 1997). *Page 86 
The record shows that, at the time of the events giving rise to this case, Crutcher was 16 years old and was an employee at the restaurant. The restaurant, located at 2614 Memorial Parkway in Huntsville, was owned and operated by Wendy's. Crutcher worked part-time as a cashier. On Sunday, July 25, 1999, she began work at 11:00 a.m. at the cash register for the drive-through window. Also working the drive-through window that day was Genora Gordon, Crutcher's co-employee and her aunt. Tiffany Erskine, an assistant shift manager, was also working the 11:00 a.m. shift on that date. Her duties as assistant shift manager included counting the money from the cash registers. At approximately 2:00 p.m. that day, Erskine removed the money from the drive-through-window cash register and took it to the office and proceeded to count it.[1] After counting the money, Erskine thought that the cash register from the drive-through window was $50 short. As the assistant shift manager, it was Erskine's duty to conduct an "investigation" into the apparently missing money. She went back to the front of the restaurant to look for the money, and she asked the cashiers if there had been any "over-rings"[2]
or if anyone had been in the office or had seen the money on the desk in the office. None of the employees indicated that they knew anything about the missing money. The record shows that Crutcher, Gordon, and Erskine were the only employees who had access to the drive-through-window cash register during the 11 a.m. shift. Erskine notified the employees present that she was telephoning the police to report the missing money, which she then proceeded to do. While on the telephone with the police operator, Erskine asked what the police could do to help locate the missing money. Erskine was told by the operator that, with the employees' approval, the officers could search the employees to determine if any one of them had the missing $50. Erskine notified the police despite the fact that she knew Wendy's policy was that the police were not to be called unless there was a fire or robbery at a restaurant. Erskine testified that she was aware of that policy because she had been told by Michelle Robinson, the restaurant manager, about the circumstances under which the police were to be called to the restaurant. Erskine further testified that such policy was ordered by Clyde Newman, the president of Wendy's and a shareholder.[3]
After Erskine's telephone call to the police, three Huntsville police officers arrived at the restaurant. They stated that they could ask each employee if he or she would consent to a search, and if an employee said no, then that employee would not be searched. Erskine testified in her deposition that, after the police told her what they could do, she asked them to search all of the employees, including herself. Crutcher stated that Erskine also told the police officers that Crutcher, Gordon, and she were the only employees who had gone into the restaurant office that day.
The officers proceeded to conduct an investigation. They asked Gordon, in Crutcher's presence, if she would consent *Page 87 
to being searched; Gordon refused. Crutcher initially testified in her deposition that the officers then "asked" her to go into the office to be searched. However, later in her deposition, Crutcher stated that she was "told" by the officers to go into the office to be searched. At any rate, she complied and accompanied a female officer into the office. During the course of the search, with only Crutcher and the female officer present, the officer searched under various articles of Crutcher's clothing. Crutcher was the only employee to be searched in this manner by the police. Crutcher testified that she did not say anything to the officer during the search. The record indicates that only Crutcher and Erskine were searched. Erskine testified that during her search she was ordered by the officer conducting the search to pull up her shirt, but the officer searched only under her bra. The officer also searched her socks and pockets.
While Crutcher was being searched, Gordon telephoned Crutcher's grandmother, Rebecca Gaines, who drove to the restaurant. Crutcher left the restaurant with Mrs. Gaines and never returned to work there. Crutcher's shift that day would have ended at 5:00 p.m., and various time references in the record show that Crutcher left with her grandmother before the end of her shift. Crutcher testified in her deposition that she was not fired by Wendy's and that Wendy's later requested that she return to work.
Crutcher makes the separate assertions in her initial brief to this Court that, not only was the missing $50 not found on her person, but that "[i]n fact it was later discovered that the $50 was never missing and had never been stolen" and that "[t]he $50 was never stolen. At some point, Erskine found the money." Only one citation to the record is provided for these unqualified statements, "C. 744," but that page of the record, a page from the lengthy "Plaintiff's Response to the Defendant's Motion for Summary Judgment," contains no information relating to the statements. Crutcher also further asserts in her brief that "Erskine did have the money somewhere in the store and did find the money." Her citation to the record following that statement is "C. 60," which, in turn, is a page from the brief Wendy's filed in support of its motion for a summary judgment. Again, we find nothing on that page of the record that relates in any way to Crutcher's allegation that Erskine found the missing money. We do not find anywhere in the entire record for this appeal any support for the emphatic statements Crutcher makes that the $50 was found at some point in time, much less that Erskine was the one who found it.
Erskine testified in her deposition that the missing $50 was never located. Nicole Watkins, an assistant manager who arrived at the restaurant on the day in question after Erskine had determined that the money was missing, but before the police had arrived, testified that she undertook a "recount" of not only the drive-through-window cash register, but also the front register, on the chance that Erskine could have made a mistake, but she found that the register records were "both correct." Watkins then counted the money Erskine had in the office, "and it was $50 short." When asked if the $50 was "ever later discovered," Watkins answered that it was not.
Crutcher also calls our attention to certain deposition testimony in the record, which, it appears, is actually what she is relying on in making the statements to this Court that Erskine found the missing money. First, Mrs. Gaines testified that "early Monday morning" (the incident occurred on a Sunday) she telephoned *Page 88 
Michelle Robinson at the restaurant. According to her, Robinson said "I don't think that $50 was missing. It could have been in some change." She said, "I think it was in some change somewhere. That's what she told me about the $50. She don't think it was missing. But she think it was in some change she[4] had put up somewhere." At another point Mrs. Gaines reprised that conversation by stating that Robinson had "stated that she didn't think the money was missing; that it was in change somewhere that she[5] had put it." As previously noted, however, Robinson was not at the store at any time on the day in question and her remarks can be understood only to represent a personal belief arising from speculation. The other record reference Crutcher makes in this regard is to the portions of her deposition testimony where, after being asked if the $50 had ever been located and, answering "I think it was," and being further asked where it had been located, she answered "I'm not sure. I think they had miscounted or something. I'm not exactly sure what happened." She explained that she thought "Genora [Gordon] was the one who told [her]," that they money had been located.
All we are left with in the final analysis, having read the portions of the record cited by Crutcher and having otherwise thoroughly reviewed the entire record, is that Robinson stated to Mrs. Gaines Robinson's speculative belief that the money might well not be missing at all and that it "could have been in some change." Accordingly, we do not find in the record any genuine issue of material fact to contradict the statements of Erskine and Watkins that the missing money was never found.
The trial court's summary-judgment order stated, in pertinent part:
 "I. Crutcher has not established a prima facie case of false imprisonment.
 "A. Crutcher was not detained unlawfully by force or threat of force.
 "This Court finds that there was no direct restraint on her person, either by an exercise of force or an express or implied threat of force which compelled her to go where she did not want to go. Sanders [v. Shoe Show, Inc.], 778 So.2d [820] at 823 [(Ala.Civ.App. 2000)]. Additionally, the Court finds that Erskine was acting outside the line and scope of employment when she called the police.
 "This Court finds that there was no arrest or detention of Crutcher. No Wendy's employee or police officer ever told Crutcher she could not leave the restaurant. (Crutcher depo., pp. 66-67, 69, 70). No Wendy's employee ever told the police to keep Crutcher from leaving the restaurant. (Crutcher depo., p. 86). And no Wendy's employee ever physically kept her from leaving the restaurant. (Crutcher depo., p. 86). Crutcher needed no permission from Erskine or Watkins, her supervisors at Wendy's, to leave the restaurant. (Crutcher depo., p. 119). There is no evidence that Crutcher ever intended to leave the restaurant on July 25, 1999 up until the time her grandmother came to the restaurant, at which time she left without incident. (Crutcher depo., p. 75; Rebecca Gaines depo., p. 34). Crutcher presents no evidence that she tried to leave earlier in the day. Neither Wendy's of North Alabama, Inc., nor any of its agents or employees ever detained Crutcher. (Crutcher depo., p. 86).
". . . . *Page 89 
 "B. Crutcher voluntarily consented to a search by Huntsville Police Officers.
 "Even if Crutcher could establish that she was `detained,' she still cannot establish a prima facie case of false imprisonment because her `detention' was lawful, in that it was pursuant to her voluntary consent. Huntsville City Police officers approached Crutcher and Gordon. They asked Gordon to come to the office and allow them to search her. (Crutcher depo., p. 47). Gordon said she wouldn't allow them to search her. (Crutcher depo., pp. 47, 185). The police officers didn't do anything to Gordon when she refused to let them search her. (Crutcher depo., p. 186). Crutcher observed this firsthand and she also heard the police officers tell Gordon that it was her choice whether to be searched or not. (Crutcher depo., p. 186). The police officers then asked Crutcher to go into the office for a search of her person. (Crutcher depo., p. 47). Gordon told the police officers not to search Crutcher. (Crutcher depo., p. 48). The police officers told Gordon that she couldn't tell Crutcher what to do and that Crutcher had to tell the police officers on her own that she didn't want to be searched. (Crutcher depo., p. 48). Crutcher still agreed to go with the officers to the office and to allow the officers to search her. (Crutcher depo., p. 49). Even though she witnessed Gordon's refusal to be searched and realized that nothing happened to Gordon based on her refusal, and after hearing Huntsville Police officers state to Gordon that Crutcher could object to the search on her own, Crutcher never told any of the police officers that she did not want to be searched. (Crutcher depo., p. 115). Given that she agreed to be searched, and immediately left when she wanted to leave, the Court finds that Crutcher was not unlawfully detained. For there to be a false imprisonment, there must be some direct restraint of the person. See Sanders v. Shoe Show, Inc., 778 So.2d at 822-23.
 "C. Erskine acted in good faith when she provided information to the Huntsville Police Department. Regardless, no actions of Wendy's of North Alabama, Inc., or its agents or employees led to an unlawful detention of Crutcher.
". . . .
 "Erskine and Watkins told the police officers that Crutcher might have taken the money because she is one of the persons Erskine could remember being in the restaurant office. (Crutcher depo., p. 90). Erskine told the police that Crutcher had been in the office that day. (Crutcher depo., p. 131). Crutcher had gone to the office that day and reached her arm into the office and put her hat on the TV in the office. (Crutcher depo., 131). Erskine told police that she suspected Crutcher may have taken the money, and that her suspicions were simply based upon Erskine's knowledge that Crutcher had gone to the office. (Crutcher depo., pp. 130-132). There were no other statements made by any other Wendy's employees which Crutcher claims were false. (Crutcher depo., p. 91).
 "This Court finds that `it is well-settled that liability for false imprisonment, like liability for malicious prosecution, cannot be predicated merely on a person's good faith act of giving information to a police officer tending to show that a crime has been committed or on a person's good faith act of identifying one suspected of a crime, for such involvement in another's detention or arrest is not regarded in the law as an instigation of or participation in the detention or arrest.' Crown Central Petroleum *Page 90 Corp. v. Williams, 679 So.2d 651[, 654] (Ala. 1996).
". . . .
 "II. Crutcher has not established a prima facie case of slander.
 "`Slander to be actionable per se must impute an indictable offense involving infamy or moral turpitude.' Lewis v. Ritch, 417 So.2d 210, 211
(Ala.Civ.App. 1982). `Words which impute larceny are slanderous per se.' Id. at 211-212. . . . Truth is an absolute defense to defamation. See Foley v. State Farm Fire Cas. Ins. Co., 491 So.2d 934 (Ala. 1986); Liberty Loan Corp. v Mizell, 410 So.2d 45
(Ala. 1982).
". . . .
 "Crutcher cannot establish a prima facie case of slander because the statements she claims Erskine and perhaps Watkins made to the police officers, that is, that Gordon and Crutcher `were the only ones in the office they could remember,' were true. (Crutcher depo., p. 43).
 "The statements that Crutcher alleges that Erskine and Watkins made to the police — that Crutcher had been in the office — were not slanderous because they did not impute larceny, but rather stated the facts as Erskine and Watkins (and even Crutcher) knew them.
". . . .
 "The Court finds that . . . any and all statements by Wendy's of North Alabama, Inc. alleged by Crutcher to be slanderous were truthful, and finds that the defendant is therefore entitled to summary judgment on plaintiff's slander claim. Further, the Court finds that any statements by Wendy's of North Alabama, Inc., were not false and malicious, and finds that the defendant is therefore entitled to summary judgment on plaintiff's slander claim. Further, the Court finds that Erskine acted outside the line and scope of her employment with Wendy's of North Alabama, Inc., and finds that the defendant is therefore entitled to summary judgment on plaintiff's slander claim. Further, the Court finds that Erskine acted in good faith when she provided information to the Huntsville Police Department, and finds that the defendant is therefore entitled to summary judgment on plaintiff's slander claim. Finally, the Court finds that each of these separate and independent grounds is sufficient to find that Crutcher was not slandered and is sufficient to support a finding for the defendant on plaintiff's slander claim.
 "III. Crutcher cannot establish a prima facie case of invasion of privacy.
 "The Court finds that the police officers used their own authority and own independent discretion in conducting the investigation and search, and that the police officers were not directed by Wendy's of North Alabama, Inc. Crutcher cannot establish a prima facie case of invasion of right to privacy against Wendy's. Moreover, since Crutcher voluntarily consented to the search by the Huntsville Police officer, she cannot claim that her right to privacy was invaded by the search. (Crutcher depo., p. 49)."
(Emphasis original.)
 Issues Presented For Review
Crutcher designates 18 issues in her "Statement of Issues Presented for Review" and then proceeds to argue each separately. She first asserts that the trial court did not use the appropriate "standard of review" when it granted the summary-judgment motion filed by Wendy's. In support of this contention, she cites several decisions from this Court and the Court of Civil Appeals, which set out the *Page 91 
appropriate standard to be used by a trial court considering a motion for a summary judgment. Crutcher does not, in the section of her brief relating to this contention, offer any specifics as to what supposedly deviant standard the trial court here used, or how its standard deviated from the proper standard. Instead, Crutcher's argument regarding the proper standard to be used by a trial court when considering a summary-judgment motion appears to be the predicate for several of her other issues on appeal, most of which are premised on the idea that genuine issues of material fact existed as to the essential elements of her claims. Accordingly, we consider those other issues.
 A. Wendy's Liability for the Acts of its Employees
In its order, the trial court found that "Erskine was acting outside the line and scope of her employment when she called the police." Crutcher asserts that a genuine issue of material fact exists as to whether Erskine was acting within the scope of her employment for Wendy's at the time the events at issue in this case transpired. The record shows that Erskine's counting of the money in the cash register was part of her job duties. Further, upon her "count down" of the money and her resulting belief that $50 was missing, Erskine attempted to locate the missing money, also as her duties required. Although Erskine stated in her deposition that, in an effort to avoid upsetting Newman, she and Watkins would repay the cash registers out of their own pockets in the event a register came up short, it was Erskine's responsibility as the assistant shift manager, and the highest ranking manager present at the store at the time of the incident, to investigate the shortage.
 "`A corporation or employer will be liable for the torts of its employee committed while acting in the line and scope of his employment even though the corporation or employer did not authorize or ratify such acts and even if it expressly forbade them. Old Southern Life Ins. Co. v. McConnell, 52 Ala. App. 589, [594,] 296 So.2d 183[, 186] (Ala.Civ.App. 1974). If there is any evidence in the record tending to show directly, or by reasonable inference, that the tortious conduct of the employee was committed while performing duties assigned to him, then it becomes a question for the jury to determine whether he was acting from personal motive having no relationship to the business of the employer. Plaisance v. Yelder, 408 So.2d 136 (Ala.Civ.App. 1981); United States Steel Co. v. Butler, 260 Ala. 190, 69 So.2d 685 (1953).'
 "Lawler Mobile Homes, Inc. v. Tarver, 492 So.2d 297, 305 (Ala. 1986)."
USA Petroleum Corp v. Hines, 770 So.2d 589, 591 (Ala. 1999). In light of Erskine's duties as assistant shift manager, we conclude that a genuine issue of material fact exists as to whether she was acting within the scope of her employment in telephoning the police. Because we conclude that Wendy's could be liable as a result of Erskine's actions, we must next consider whether the trial court properly entered a summary judgment for Wendy's as to Crutcher's claims of false imprisonment, slander, and invasion of privacy.
 B. False Imprisonment
Crutcher contends that a genuine issue of material fact exists as to whether she was detained or searched in such a manner as to violate Ala. Code 1975, § 6-5-170, Alabama's false-imprisonment statute. Section6-5-170 provides: "False imprisonment consists in the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." In Crown Central Petroleum *Page 92 Corp. v. Williams, 679 So.2d 651, 653 (Ala. 1996), citing Big B, Inc. v.Cottingham, 634 So.2d 999 (Ala. 1993), this Court held:
 "For there to be a false imprisonment, there must be some direct restraint of the person; however, it is not necessary that there be confinement in a jail or a prison. Any exercise of force, or the express or implied threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment."
See also Sanders v. Shoe Show, Inc., 778 So.2d 820, 822 (Ala.Civ.App. 2000). The Williams Court also stated that "[a]n employer may be held legally liable for a false imprisonment committed by one of its employees while acting within the line and scope of his employment," 679 So.2d at 653-54, and that "persons other than those who actually effect an arrest or imprisonment may also be so involved with or related to the act or proceeding as instigators or participants therein as to be liable for false imprisonment." 679 So.2d at 654.
Our review of the record indicates that a genuine issue of material fact exists as to whether Crutcher was unlawfully detained, arising from her testimony that she was "told" by the officers to accompany them for the search and that she believed she was required to obey them because of their authority as police officers. However, under Alabama law an employer will not be held liable for false imprisonment for the acts of its employees in providing information to the police, which causes someone to be detained, if the employee's communications to the police were made in good faith. Williams, supra. In Williams, a mother, on behalf of her minor son, sued the owner of a convenience store alleging that an employee of the store had caused her son to be falsely imprisoned by the Birmingham Police after the employee told the police that the son had accompanied another man to the store, and that that other man had "crouched down" and stuck the barrel a handgun "up into the store's security drawer"[6] and robbed her. 679 So.2d at 653. Following an adverse jury verdict, the owner of the convenience store appealed, arguing that its employee had merely reported the commission of a crime to the police and identified the plaintiff's son as being in the company of the armed robber. The plaintiff argued, however, that it could be inferred from the evidence that the defendant's employee stole the money and then concocted the robbery claim to conceal her own theft. As the trial court in the present case aptly noted in its order, the Williams
Court, reversing the jury verdict, stated:
 "[I]t is well settled that liability for false imprisonment, like liability for malicious prosecution, cannot be predicated merely on a person's good faith act of giving information to a police officer tending to show that a crime has been committed or on a person's good faith act of identifying one suspected of a crime, for such involvement in another's detention or arrest is not regarded in the law as an instigation of or participation in the detention or arrest."
679 So.2d at 654. The Williams Court also stated "a person does not instigate an arrest by merely providing information that results in another's arrest, unless the person acts in bad faith (i.e., lacks any reasonable basis upon which to accuse another of a crime)." 679 So.2d at 655. The Court went on to hold that the only *Page 93 
evidence cited to support the plaintiff's contention that the robbery claim had been concocted was
 "1) that the plaintiff's son denied that any robbery had taken place; 2) that the store was locked and that [the employee] reported to the police that the [robber] had threatened her with a gun through the security drawer; 3) that [the employee] failed to testify during the juvenile proceedings; 4) that the store's surveillance camera was for some unknown reason not working on the night of the incident; and 5) that [the employee] told the plaintiff that the plaintiff's son had not done anything. Even looking at this evidence in the light most favorable to plaintiff, as we are required to do, we fail to see how the jury could have reasonably inferred from it, that [the employee] stole the money and then made up the whole story concerning a robbery."
679 So.2d at 655-56 (emphasis added). Thus, in Williams there was no evidence indicating that the employee acted in bad faith when she telephoned the police reporting that a robbery had been committed; rather, the evidence supported only the inference that she had acted in good faith.
In this case, Erskine reported to the police that $50 was missing from one of the cash registers at the restaurant. Erskine did not know exactly what the police would do upon their arrival at the restaurant. Initially, she only wanted them to "make a police report." However, upon learning that the police could conduct a search of the individual employees, if they consented, she did ask the police to propose such a search to the employees. Specifically, Erskine stated:
 "Q: What happened after the police came in the store? Who did they talk to first?
"A: Me.
"Q: What did you tell them?
 "A: I told them that I had $50 missing, and I've counted all of my registers, and I can't find it, and I don't know who has it, what can they do about it, you know, what kind of action can I take. They said, well —
"Q: You reported to them that you're missing $50?
"A: Yes.
"Q: And you asked them what actions you can take?
 "A: Right, can they take — I've called the police because I'm missing money. The operator told me they could come out for that. I asked her what they could do. She said that they could take a search of everybody in the store, so I said send them.
 "Q: Who told you that the police could search everybody in the store?
"A: They did and the operator did.
 "I said, what can they do to find this money. They said that they have to have the approval, they can't just come and search everybody. When they got there, they told everybody what the situation was, which they already knew, and they said, we're going to ask if we can search everybody. If you say no — you have the right to say no. If you say no, we can't search you.
 "Q: The operator told you that the police could search everybody in the store?
"A: Uh-huh.
 "Q: When the police arrived, did either officer tell you that they could search everybody in the store?
"A: If they allow them to, yes.
"Q: Which officer told you that?
"A: I don't know. I don't even know the officer's name. . . .
". . . . *Page 94 
 "Q: Did you tell the officers that you wanted them to search everybody in the store and that you had already thought about that?
"A: Yes.
 "Q: Did you tell the police officers that you wanted them to search everybody in the store?
"A: Yes.
 "Q: When you told the police officer that you wanted everybody in the store searched, was that such — do you know whether or not Davida heard you tell the police officer that?
 "A: I don't think so. It was more like they said that's what they can do.
"I said, well, can you do it?
"Q: The police said they could search everybody in the store?
"A: If they allow them to search them.
 "Q: You told the police that you wanted them to search everybody in the store?
"A: I said I wanted them to search everybody in the store.
"Q: You search everybody, you told them to do that; is that correct?
". . . .
"A: I asked them to do it. I didn't tell them anything.
 "Q: And you — and if you earlier said that you told the police to search everybody in the store, you want to change your testimony?
". . . .
"A: I asked them to. I didn't tell them to."
Our careful review of the entire record fails to reveal any evidence of bad faith on the part of Erskine; the record supports only the inference that she acted in good faith when she telephoned the police regarding the missing money, when she accepted their offer to conduct consensual searches, and when she imparted information to them on the scene concerning who had had access to the drive-through-window cash register and who she understood had entered the office.[7] Accordingly, we hold that the trial court did not err by entering a summary judgment in favor of Wendy's as to Crutcher's false-imprisonment claim.
 C. Slander
Crutcher also asserts that the trial court erred in entering a summary judgment for Wendy's on her slander claim. Specifically, she argues that a genuine issue of material fact exists as to whether Erskine's accusations were made in good faith. Crutcher relies on Liberty NationalInsurance Co. v. Daughtery, 840 So.2d 152 (Ala. 2002), for the proposition that slander involves a false and malicious communication to a third person involving infamy or moral turpitude. Crutcher also states that "[t]ruth or good faith are defenses [to slander]."
Good faith is a defense to defamation only in the limited circumstances *Page 95 
where a defamatory statement is made pursuant to a qualified privilege.Atkins Ford Sales, Inc. v. Royster, 560 So.2d 197 (Ala. 1990). See alsoKirby v. Williamson Oil Co., 510 So.2d 176 (Ala. 1987). The plaintiff bears the burden of proving defamation with actual malice to prevail against a defense of qualified privilege, and the defendant does not bear the burden of proving good faith to establish such a defense. Ex parteBlue Cross Blue Shield of Alabama, 773 So.2d 475 (Ala. 2000). In the instant case, however, no contention has been made that any alleged statement by an employee of Wendy's was made pursuant to a qualified privilege. Therefore, the defense of good faith has no application here. Nonetheless, in all defamation actions, "[t]ruth is an absolute defense to defamation." Foley v. State Farm Fire Cas. Ins. Co.,491 So.2d 934, 937 (Ala. 1986). See also Liberty Loan Corp. v. Mizell,410 So.2d 45 (Ala. 1982).
In actions for libel or slander, the defendant ultimately bears the burden of showing that the defamatory words are true. Brothers v.Brothers, 208 Ala. 258, 94 So. 175 (1922). See also Starks v. Comer,190 Ala. 245, 67 So. 440 (1914). Although Wendy's would bear the burden of showing that any allegedly slanderous statements by any of its employees regarding Crutcher were true, in order to vindicate the defense of truth, Crutcher bore the initial burden of showing a false communication. "To establish a prima facie case of defamation, the plaintiff must show that the defendant published a false and defamatory statement concerning the plaintiff to a third person." Atkins FordSales, 560 So.2d at 200, citing Nelson v. Lapeyrouse Grain Corp.,534 So.2d 1085 (Ala. 1988).
Crutcher makes no specific argument in her briefs to this Court that any statement by an employee of Wendy's pertaining to her possible involvement with the missing money was untrue. Rather, Crutcher merely references the speculative beliefs of others concerning the possible whereabouts of the money, which are never shown to have been validated, and argues that Erskine could not possibly have entertained the contrary belief — that the money had probably been stolen — in good faith. Any mere beliefs of others, the foundations for which are not shown, would not detract from the truth of what Erskine believed: that $50 was missing and that she, Gordon, and Crutcher were the only employees who had had access to the areas of the restaurant where the funds from which the shortage was discovered were located.
No genuine issue of fact has been shown to exist regarding whether the statements Crutcher relies on as defamatory — Erskine's expressions of her beliefs to the police and her identification of her, Gordon, and Crutcher as persons having access to the missing money — were in fact true, as far as they went. Accordingly, we conclude that the trial court did not err in entering a summary judgment for Wendy's on the slander claim.
 D. Invasion of Privacy
Crutcher further asserts that a genuine issue of material fact exists as to whether she consented to the search conducted by the Huntsville police, thereby precluding a summary judgment as to her invasion-of-privacy claim. As we noted earlier in the opinion, we have determined that an issue of fact exists as to whether Crutcher consented to the search conducted by the Huntsville police. However, we must also consider whether Wendy's is otherwise entitled to a judgment as a matter of law on this claim. "`This Court defines the tort of invasion of privacy as the intentional wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, *Page 96 
shame, or humiliation to a person of ordinary sensibilities.'" Rosen v.Montgomery Surgical Ctr., 825 So.2d 735, 737 (Ala. 2001) (emphasis added) (quoting Carter v. Innisfree Hotel, Inc., 661 So.2d 1174, 1178
(Ala. 1995) (citing Nipper v. Variety Wholesalers, Inc., 638 So.2d 778
(Ala. 1994), and other cases)). In Nipper, an employer at a discount store had received complaints from other employees regarding the plaintiff store manager's conduct while at work. Specifically, the employer had received complaints that the plaintiff possessed a handgun at work, took drugs, had birthday parties in the stock room, and had her boyfriend in the store on many occasions, all of which activities were in violation of the employer's disciplinary policy. In addition, there had been a $30,000 loss of inventory at the store. In response to those complaints, the employer had another employee "investigate" them by interviewing other employees, including the plaintiff. The plaintiff admitted to having carried a handgun to work, admitted that her boyfriend often visited the store, and admitted that she had taken prescription medication during working hours that made her sleepy. However, she denied attending parties held at the store. Soon after the interview, the plaintiff was terminated from her position. Subsequently, she sued the employer, asserting claims of the tort of outrage, invasion of privacy, and slander. The trial court entered a summary judgment in favor of the employer on all claims; the plaintiff appealed. Holding that the plaintiff did not produce sufficient evidence to sustain her invasion-of-privacy claim, this Court stated:
 "[The employer] had the right to reasonably investigate complaints made about the store and against [the plaintiff] in relation to [the plaintiff's] status as manager of the store. It was not unreasonable for [the employer] to be concerned about complaints such as it received, particularly in light of the $30,000 worth of inventory that had been lost from the store. This alleged intrusion into [the plaintiff's] private concerns falls short of that required to constitute the invasion of privacy tort."
638 So.2d at 781.
In the instant case, we conclude that the analogy between the elements of Crutcher's false-imprisonment claim, as analyzed in Part B of this opinion, and the elements of her invasion-of-privacy claim, calls for similar resolution in both instances. As we noted in discussing the false-imprisonment claim, the evidence does not contradict Wendy's position that Erskine acted in good faith when she contacted the Huntsville police to investigate the missing $50. Further, the evidence supports only the conclusion that Erskine's act of launching and continuing the investigation into the missing $50 was reasonable and without malice toward Crutcher. There is no evidence suggesting that Erskine acted in bad faith.
Our conclusion in this regard is strengthened by the fact that Erskine did not personally attempt to investigate the situation after initially looking for the money on the premises and asking the employees for information, but rather telephoned the police and asked them to investigate the matter. At all times she provided them with information not successfully impugned by Crutcher as untrue. We do not believe that Crutcher's inclination, asserted in her deposition, to comply with requests by police officers because of the deference she accorded such authority figures should render Erskine's involvement in the process "wrongful," so as to constitute an invasion of Crutcher's privacy. Accordingly, the trial court did not err by entering a summary judgment in favor of Wendy's as to Crutcher's invasion-of-privacy claim. *Page 97 
Crutcher's remaining arguments present various assertions about factual contentions that are neither supported by citations to the record nor specifically relevant to her legal claims. Moreover, those arguments either are unsupported by proper citation to legal authority, violate Rule 28(a), Ala.R.App.P., or were not argued to the trial court. "`Where an appellant fails to cite any authority, we may affirm, for it is neither our duty nor [our] function to perform all of the legal research for an appellant.'" McLemore v. Fleming, 604 So.2d 353, 353 (Ala. 1992) (quoting Gibson v. Nix, 460 So.2d 1346, 1347 (Ala.Civ.App. 1984)).
 "Appellants who fail to comply with [Ala.]R.App.P. 28(a) place themselves in a perilous position. While we attempt to avoid dismissing appeals or affirming judgments on what may be seen as technicalities, we are sometimes unable to address the merits of an appellant's claim when the appellant fails to articulate that claim and presents no authorities in support of that claim. Under appropriate circumstances we will refuse to consider the appeal."
Stover v. Alabama Farm Bureau Ins. Co., 467 So.2d 251, 253 (Ala. 1985). "Failure to cite any authority supporting [the appellant's] arguments precludes this court from considering the issues presented." Sanders v.Mullins, 579 So.2d 1349, 1350 (Ala.Civ.App. 1990). "This Court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court." Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala. 1992). See also Brannan Guy, P.C. v. City of Montgomery, 828 So.2d 914,919 (Ala. 2002); TFT, Inc. v. Warning Systems, Inc., 751 So.2d 1238, 1243
(Ala. 1999). Accordingly, we will not consider these arguments.
Our review in this case has necessarily been limited to the narrow process of determining whether the contents of the record reveal undisputed facts, or the existence of genuine issues of material fact, favorable to Crutcher as to the existence of all of the elements of one or more of her asserted causes of action. As explained above, our review has revealed none. The constraints of objective legal analysis do not blind us to the fact, however, that Davida Crutcher, whom the record essentially exonerates with respect to the suspected misappropriation of $50, was subject to treatment naturally traumatic to a 16-year-old. Accordingly, our opinion in this case, based solely on the law, does not represent approval of how Davida Crutcher was treated nor are we insensitive to her plight.
For the reasons already explained, the trial court's summary judgment in favor of Wendy's as to Crutcher's false-imprisonment, slander, and invasion-of-privacy claims is affirmed.
AFFIRMED.
MOORE, C.J., and SEE, BROWN, and STUART, JJ., concur.
[1] In her deposition testimony, Erskine refers to the procedure of counting the money in the cash registers as a "count down," which she said occurs at various times throughout the operating hours of the restaurant. A "count down" shows how much business a particular cash register has done since the preceding "count down."
[2] Erskine stated in her deposition testimony that over-rings are deducted from the amount of cash in the drawer. However, she did not specify what an over-ring actually is.
[3] Neither Robinson nor Newman were in the restaurant on July 25, 1999.
[4] It is unclear from the record whether the pronoun "she" was a reference to Erskine or Robinson.
[5] See note 4.
[6] In accordance with company policy, the door to the store was locked, and customers made their purchases using the security drawer.
[7] Crutcher argues in her brief, and so testified on deposition, that she never actually entered the office on the day in question, because she just reached into the office to put her hat in there. She also acknowledged on her deposition as follows:
 "Q. Do you have any personal knowledge of whether or not Tiffany Erskine actually thought she had seen you in the office that day, the date in question?
"A. Could you rephrase it?
 "Q. Sure. Do you yourself know, have any personal knowledge of whether or not Tiffany actually thought she had seen you in the office on the date in question?
 "A. Probably because she told me to put my hat in there. But other than that, no."