MURDOCK, Judge.
K.S. (“the mother”) appeals from an August 2004 order entered by the Walker Juvenile Court awarding custody of her son, W.S., to G.A.B. and his wife, W.G.B. (JU-01-490.03). G.A.B. is the cousin of the mother’s fiancé, Tr.D. Our case number for this appeal is 2031140.
The mother also appeals from a September 2004 order entered by the Walker Juvenile Court transferring custody of three of her other children to the Walker County Department of Human Resources (“DHR”). The three children are: A.S., a son and W.S.’s brother (JU-01-489.03); T.D., a daughter by Tr.D. (JU-03-248.02); and N.G.D., a son by Tr.D. (JU-04-386.01). Our case number for this appeal is 2040019.
Tr.D. also appeals from the September 2004 order as to T.D. and N.G.D. Our case number for Tr.D.’s appeal is 2040043. We have, ex mero motu, consolidated the appeals in case numbers 2031140, 2040019, and 2040043 based on their common procedural history.
A.S. was born in March 1995 and W.S. was born in July 1996. T.D. was born in January 2000; N.G.D. was born in May 2003. A.S. and W.S. are children of the mother and D.S., who was also a party to the underlying proceedings regarding W.S. and A.S.; D.S. has not appealed.[1] The mother and D.S. divorced in 1999; they apparently were awarded joint custody of their children.
To prevent confusion and unnecessary repetition, the following recitation of procedural history reflects findings of fact that were made by the trial court and that are supported by the evidence presented to the trial court, or findings that are supported by the evidence and that would support the trial court’s judgment. See Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996) (holding that in the absence of specific findings of fact, an appellate court will assume that the trial court made those findings necessary to support its judgment, unless such findings would not be supported by the evidence).
From the time W.S. was 18 months old until approximately 2001, he was “passed off from person to person,” including D.S., the mother, his paternal grandparents, and Tr.D.’s mother, B.M. At some point in 2001, however, W.S. resided primarily with D.S. on weekdays and with G.A.B. and W.G.B. on weekends. Thereafter, the portion of each week during which W.S. resided with G.A.B. and W.G.B. increased without objection from the mother. By December 2002, G.A.B. and W.G.B. were caring for W.S. on a full-time basis, although W.S. continued to stay with D.S. on occasion.
On Christmas Day 2002, the mother requested that G.A.B. and W.G.B. allow W.S. to visit with her and her other children. W.G.B. honored the mother’s request and delivered W.S. to the mother’s residence at 10:00 a.m. on Christmas Day. A few hours later, however, the mother contacted W.G.B. and requested that she retrieve W.S. because the children were “driving her crazy.” Christmas Day 2002 was the last time the mother had actual physical custody of W.S.
In February 2003, police raided the mother and Tr.D.’s residence where they “found enough evidence to charge them with ‘Attempting to Manufacture *1088 Meth[amphetamine].’ ”[2] The incident was reported to Walker County DHR, which also had received reports in late 2002 and early 2003 that D.S. was engaged in illegal drug activity. In March 2003, DHR opened protective-services cases on K.Sa., A.S., W.S., and T.D. As noted above, neither K.Sa. nor W.S. was residing with the mother at the time. The mother was pregnant with N.G.D. when DHR opened the protective-services cases on the aforementioned children.
Pursuant to a safety plan instituted by DHR, A.S. was placed in the custody of his paternal grandmother, B.S., where K.Sa. already resided, see note 1, supra; W.S. remained in the custody of G.A.B. and W.G.B.; and T.D. was placed in the custody of her paternal grandmother, B.M. The mother and Tr.D. were allowed supervised visitation with A.S., W.S., and T.D. Also, pursuant to Ala.Code 1975, § 26-2A-7, the mother executed “Delegations of Parental Authority” in favor of the respective children’s custodians “granting [to the custodians] physical custody and authority to make any decision relating to the physical custody, health, education, or maintenance” of A.S., W.S., and T.D.
On April 6, 2003, T.D., along with her custodian, B.M., spent the night with the mother and Tr.D. At approximately 1:00 p.m. on April 7, 2003, while B.M. was in another room of the house, the mother and Tr.D. took T.D. and left the home. B.M. contacted the police and DHR. DHR located the mother and Tr.D. and requested that they return T.D., but the mother and Tr.D. were uncooperative. DHR filed petitions in the Walker Juvenile Court alleging that A.S. (JU-01-489.02), W.S. (JU-01-490.02), and T.D. (JU-03-248.01) were dependent children.[3] The petitions alleged that the mother had attempted to abscond with T.D. in violation of a safety plan, and that all three of the children were at risk. DHR requested that the trial court award it “the temporary care, custody and control” of A.S., W.S., and T.D.
Upon the filing of the dependency petitions, the trial court immediately issued ex parte pick-up orders for A.S., W.S., and T.D. In those orders, the trial court also awarded DHR pendente lite custody of the children and set the cases for a 72-hour hearing to be held on April 8, 2003, at 2:00 p.m. The record reflects that D.S. was served with the petitions and summons on April 7, 2003, and that the mother and Tr.D. were served with the petitions and summons on April 8, 2003.
On the morning of April 8, 2003, at approximately 8:33 a.m., the trial court entered another ex parte order in which it awarded custody of W.S. to G.A.B. and W.G.B. based on a petition for custody that was verified and that also was accompanied by supporting affidavits. The petition and its supporting affidavits had yet to be filed with the clerk of the court, however.[4] See discussion, infra; see also Rule 5(e), Ala. R. Civ. P. (allowing a trial judge to accept papers for filing, “in which event the judge shall note thereon the filing date and forthwith transmit them to the office of the clerk”).
*1089 Later in the day on April 8, 2003, the trial court conducted the scheduled 72-hour hearing. The hearing transcript reflects that it was held in camera and that the following attorneys were present: the mother’s attorney, Tr.D.’s attorney, the children’s guardian ad litem, an attorney for DHR, and G.A.B. and W.G.B.’s attorney, who is listed on the transcript as the attorney for the intervenors. According to a later order that was entered by the trial court on May 6, 2003, the April 2003 hearing was also attended by G.A.B. and W.G.B., three DHR social workers (one of whom made a comment that is reflected in the hearing transcript), Tr.D., D.S., D.S.’s attorney, B.M., and B.S. The trial court also made a later finding that the mother had attended the hearing.
The hearing transcript consists of a brief colloquy between DHR’s attorney and the trial court regarding what DHR intended to do in the children’s cases, particularly the cases concerning A.S. and T.D. The hearing transcript reflects that DHR had been in contact with G.A.B. and W.G.B.’s attorney and that DHR did not intend to disturb the custodial arrangement ordered by the trial court as to W.S. The transcript also reflects that DHR intended to leave A.S. and T.D. in the physical care of B.S. and B.M., respectively, if their homes were still deemed satisfactory after further investigation by DHR. The transcript contains a few comments by other attorneys, including the mother’s attorney, and a comment from a representative from DHR, but it contains no sworn testimony. Importantly, however, no party objected to the proceedings, no party objected to the suggested custody arrangements for the children, and the mother’s attorney did not object to the entry of the ex parte pre-hearing order as to W.S.
Near the end of the April 2003 hearing, the mother’s attorney was questioned about the mother’s whereabouts for purposes of arranging a drug test. The mother’s counsel responded that the mother was “at the end of the hall.” The record reflects that the mother submitted to a drug test on April 8, 2003. The test result, which was filed in the trial court on April 9, 2003, was negative for all drugs tested for. Likewise, Tr.D. submitted to a drug test on April 8, 2003; the test result was positive for methamphetamine and negative for all other drugs tested for.
At approximately 2:25 p.m. on April 8, 2003, shortly after the designated time for the April 8, 2003, hearing, a verified petition from G.A.B. and W.G.B. entitled “Petition For Order Of Care, Custody, And Control Of A Minor” was filed with the clerk of court; the petition bore case number JU-01-490.02, but according to the case action summary sheet it was filed under a new case number, JU-01-490.03. G.A.B. and W.G.B.’s petition alleged that W.S. had resided with them, “for the majority of the time,” for the last one and one-half years; that they had been W.S.’s primary caregivers during that time; that “[sjince this court’s last order [they had] fully and completely implemented the terms and conditions of the ‘Safety Plan’ for the minor child”;[5] that the mother and D.S. had not properly cared for W.S. when he had been returned to their care; that G.A.B. and W.G.B. were the fit and proper persons to care for W.S.; and that it was in W.S.’s best interest to remain in their care. G.A.B. and W.G.B. requested that the trial court award them “permanent care, custody, and control” of W.S. G.A.B. *1090 and W.G.B. also filed sworn affidavits in support of their petition.
Also, at approximately 2:25 p.m. on April 8, 2003, the trial court filed an order bearing case number JU-01-490.02. The order stated:
“This cause having come before this Court upon the verified petition of the petitioners [G.A.B. and W.G.B.] and submitted with the Affidavit of [G.A.B.] and the Affidavit of [W.G.B.] and the same having been considered by this Court.
“IT IS THEREFORE, THE ORDER, JUDGMENT AND DECREE of this Court that said minor child, namely: [W.S.], is hereby placed in the care, custody and control of the petitioners, [G.A.B. and W.G.B.]
“IT IS THE FURTHER ORDER, JUDGMENT AND DECREE that the petitioners are hereby granted every right, duty, responsibility and privilege as if they were the parents of said minor child. As such the petitioners are hereby ordered to present this order to the petitioner’s employer to have said minor child added as a dependent on said petitioner’s health insurance policy with Fayette Medical Center.”
Except for slight differences in the handwritten date and the trial judge’s signature, and the time that the order was stamped “filed” by the clerk of court, the post-hearing order is identical to the order entered at 8:33 a.m. on the morning of April 8, 2003.[6]
The mother did not file a postjudgment motion seeking relief from the April 2003 post-hearing order; nor did she file a notice of appeal from the April 2003 post-hearing order.
On April 25, 2003, the mother filed a “Petition To Restore Custody To Natural Mother Or, In The Alternative, To Increase Visitation” in the case involving A.S. The mother’s petition was assigned a new case number (JU-01-489.03). In the petition, the mother alleged that the results of the drug test conducted after the April 2003 hearing were negative for all drugs tested for and that “all allegations were shown to be unfounded.” She requested that the trial court restore custody of A.S. to her or, in the alternative, that it increase her visitation with A.S.
On May 6, 2003, the trial court entered an order in the cases involving A.S. (JU-01-489.02) and T.D. (JU-03-248.01). In the order, the trial court determined that A.S. and T.D. were dependent children, and it awarded DHR custody of the children. The trial court also ordered DHR to investigate the home of B.M. “for the purpose of housing ... [T.D.]” and to investigate the home of B.S. “for the purpose of housing ... [A.S.] The trial court awarded the mother and Tr.D. supervised visitation with T.D., and it awarded the mother and D.S. supervised visitation with A.S. The trial court specifically stated that A.S. and T.D. were not to be removed from the homes of B.S. or B.M. during visitation and that the “parties” were not to harass any other party or the children during visitation or at home. The trial court also required that the mother and Tr.D. submit to random drug tests, that the mother submit to prenatal care for N.G.D., that Tr.D. submit to a paternity test as to T.D., and that the mother and Tr.D. submit to psychological testing. Further, the trial court stated that the “eause[s] may be set for further hearing *1091 upon proper application by any party in interest.”
In June 2003, the mother filed an “Answer To Petition For Temporary And Permanent Custody” in the case involving W.S. In the mother’s “answer,” she denied the averments of the “petition for temporary and permanent custody” filed by G.A.B. and W.G.B. and she alleged that “[t]he order entered on April 8, 2003, was ex parte and without notice to the natural mother and based on allegations found to be untrue.” The mother also filed a coun-terpetition for custody of W.S.; the coun-terpetition and answer were in the same document. In the counterpetition, the mother admitted that W.S. was a dependent child, but she alleged that she was the fit and proper person to have custody of W.S. The mother requested that the trial court “set the matter” for a hearing, that it enter an order awarding her pen-dente lite custody of W.S. pending the hearing, and that it award her custody of W.S. after the hearing. The mother’s answer and counterpetition was assigned to case number JU-01-490.03.
Contemporaneously with the filing of her answer and counterpetition in the case involving W.S., the mother also filed a similar answer and counterpetition in the case involving T.D. (The mother does not allege that the May 2004 order as to custody of T.D. was entered “ex parte and without notice” to her.) The counterpetition in the case involving T.D. was assigned case number JU-03-248.02.
On the day after the mother filed her counterpetition for custody of T.D., B.M. filed a petition for custody of T.D. alleging that DHR had completed its investigation of her home, that she desired to obtain custody of T.D., and that it would be in T.D.’s best interest to be in B.M.’s custody. DHR filed an answer denying B.M.’s allegations, specifically noting that paternity results as to Tr.D. had not been obtained and that a permanent placement should not be made with B.M. until a “family tie is confirmed.”
After the entry of the May 2003 order regarding A.S. and T.D., DHR made efforts to reunify T.D. with the mother and Tr.D. and to reunify A.S. with the mother. An October 2003 report that DHR filed with the trial court reflects that the mother and Tr.D. did not have a stable environment for T.D. and that Tr.D. had failed to maintain contact with DHR for purposes of random drug screening in the summer of 2003. The report also states that “[v]ery little progress has been made toward alleviating the, circumstances that necessitated placement.” Likewise, an October 2003 report that DHR filed as to A.S. states that the mother could not provide a stable environment for A.S. and that D.S. had not been involved in DHR’s case planning.
In March 2004, the trial court conducted a hearing as to the custody of T.D. As of the date of the hearing, test results still had not been obtained as to Tr.D.’s alleged paternity of T.D. However, at the hearing Tr.D. testified that he was the father of T.D. and B.M.’s attorney withdrew her petition for custody of T.D.
In April 2004, DHR filed a court report regarding the status of A.S. and T.D. Along with the report, DHR submitted a paternity-test result dated April 1, 2004, that indicated that Tr.D. was the natural father of T.D. According to the April 2004 report, the mother had tested negative for drugs on all of her drug tests, Tr.D. had tested negative for drugs since the summer of 2003, the mother and Tr.D. had visited regularly with A.S. and T.D., and the mother and Tr.D. were providing for A.S. and T.D. financially. The April 2004 report also stated that in January 2004 B.M. had been hospitalized and that DHR *1092 had returned T.D. to the mother’s and Tr.D.’s care at that time. DHR stated that T.D. had “done well” since she had been returned to her parents’ care, and it recommended that custody of T.D. be returned to the mother and Tr.D.
DHR’s April 2004 report also recommended that custody of A.S. remain with B.S., although it stated that it had no safety concerns about A.S. being in the mother’s care. In actuality, however, DHR had already returned A.S. to the mother’s care in March 2004, although the April 2004 report does not reflect that fact.
In May 2004, W.S.’s guardian ad litem filed a motion, “on behalf of [W.S.],” requesting that the mother be allowed to have regular visitation with W.S. pending the scheduled July 2004 hearing on the mother’s counterpetition for custody because, the guardian ad litem said, A.S. and T.D. had been returned to the mother’s custody, the mother had “no criminal background,” and the mother had “never tested positive for any controlled substance.” We note, however, that at the time the guardian ad litem filed his May 2004 motion, the mother had not visited with W.S. since Christmas Day 2002 and she had not requested that she be allowed to visit with W.S. since then. In addition, the mother had called G.A.B. and W.G.B. only twice since Christmas Day 2002 and on neither occasion did she request to talk to W.S. The day after the guardian ad litem filed his motion, the trial court entered an order directing the guardian ad litem to contact opposing counsel to “work out” temporary visitation pending the July 2004 hearing. The hearing was subsequently rescheduled for August 2004; apparently no visitation occurred in the interim.
In June 2004, based on the March 2004 hearing concerning T.D. and DHR’s April 2004 report, the trial court entered an finding that Tr.D. was the father of T.D. and relieving DHR of the custody of T.D. The trial court awarded custody of T.D. to the mother and Tr.D. The trial court also stated that “any Court Order not affected by this Court Order shall remain in full force and effect.”
A few days after the entry of the June 2004 order as to T.D., DHR filed a motion requesting that the trial court relieve it of the custody of A.S. In the motion, DHR alleged that it had returned A.S. to the mother’s care in March 2004, that it believed that it was in A.S.’s best interest to be returned to the mother’s home, and that it would be in A.S.’s best interest if the mother was awarded custody of A.S. On July 6, 2004, the trial court entered an order relieving DHR of custody of A.S. and awarding the mother custody of A.S. In the order, the trial court stated that it was retaining “jurisdiction in this cause and any party in interest may petition the court for review.”
In August 2004, the trial court conducted an ore tenus proceeding on the mother’s counterpetition for custody of W.S. and the guardian ad litem’s motion for visitation. The mother and Tr.D., their respective attorneys, DHR, and other interested parties were present at the hearing. No mention was made of the allegations contained in the mother’s “answer” until the close of trial, when the mother’s attorney abruptly stated:
“[MOTHER’S ATTORNEY]: Having notice and an opportunity to be heard is a fundamental right guaranteed by the Constitution of the United States and the State of Alabama. [The mother’s] child, [W.S.] was taken ex parte without the benefit of a hearing and an opportunity to be heard. Further, in that order there was no expressed concern about irreparable harm for immediate need for this child to be taken out of her care and custody. The order was signed when *1093 we showed up in court, no testimony was taken to show anything regarding the conduct as alleged.
“THE COURT: What does all of this have to do with our testimony today.
“[GAB. AND W.G.B.’S ATTORNEY]: Nothing.
“THE COURT: Does this have anything—
“[MOTHER’S ATTORNEY]: Ex parte Williams versus—
“THE COURT: Does this have anything to do with what I’ve heard today? Any of this?
“[MOTHER’S ATTORNEY]: Yes, sir.
“THE COURT: What?
“[MOTHER’S ATTORNEY]: And further, Judge, there has been no showing that [the mother] has been shown to be unfit in any way and we would ask this court to give her custody back.
“THE COURT: All right.”
The foregoing is the only argument regarding the mother’s “answer” allegations that occurred at trial.
On August 24, 2004, the trial court entered a 15-page order denying the mother’s counterpetition for custody of W.S. and denying the guardian ad litem’s motion for visitation. The judgment stated, in part:
“This matter initially came before this court on the 8th day of April 2003, upon Petition ... filed by [G.A.B.] and [W.G.B.] What is not set forth in the initial order of this Court in the above styled cause is that the present case along with two other companion cases was heard at the same time on April 8, 2003, namely [cases involving the mother’s other two children, A.S. and T.D.] This Court’s order of April 8, 2003, in the matter of [A.S. and T.D.], clearly reflects the presence of ... [the mother] and her attorney ... and [the child’s] guardian ad litem. On April 8, 2003, this Court received a report of the Walker County Department of Human Resources of inadequate supervision of [A.S., W.S., and T.D.] [The mother and Tr.D.] were alleged as perpetrators, the minor children had confirmed drug use in the home of [D.S.], and report domestic violence that occurred between [Tr.D.] and [the mother]. On March 25, 2004, this Court heard further testimony that [Tr.D.] was employed and remained drug free in testing since June 30, 2003, although he had previously tested positive for methamphetamines. This Court entered an order on June 15, 2004, granting legal custody of [T.D.] to her parents ... and further entered an order [in July] 2004, vesting custody of [A.S.] to [the mother].”
Thereafter, the court stated that it was “troubled by evidence presented” at the August 2004 trial, including testimony that Tr.D. had inquired about, and had been observed purchasing, an item that is allegedly used to mask drug use; testimony that in July 2003 Tr.D. and the mother had offered methamphetamine to Tr.D.’s aunt and that they had been observed under the influence of drugs; testimony that the mother, Tr.D., and D.S. had allowed W.S. and A.S. to have excessive unexcused absences from school when the children had been in their care in the past and that A.S. had excessive unexcused absences from school after he was returned to the mother’s and Tr.D.’s care in March 2004; and evidence indicating that domestic violence had continued in the mother and Tr.D.’s home, the most recent police report being from June 2004. The trial court also stated that an officer from the Walker County Sheriffs Department had testified that Tr.D. and the mother “are reported to be *1094 dealing in illegal drugs and they have been and continue to be under investigation.”
As to W.S., the trial court stated:
“The evidence is clear that for the vast majority of the life of [W.S.] he has lived with individuals other than his natural parents.... The Court finds that the family and friends (other than the parents) of [W.S.] have consistently been the primary care takers of this minor child and on the occasion when he has been in the custody and control of [the mother and D.S.] he has been neglected, ill fed, ill clothed, and exposed to a world of illegal drugs.”
The trial court continued:
“The evidence is clear that both [the mother] and [D.S.] voluntarily allowed [W.S.] to begin living with [G.A.B. and W.G.B.] ... This began on a weekend basis and expanded to Wednesday through Sunday evening visitation and in December 2002, it became 24 hours per day 7 days per week visitation.... More than one year passed before [the mother] even contacted [W.G.B.] regarding [W.S.] In fact, on one occasion in February 2003, ... [when W.S.] was sick, [W.G.B.] had an occasion to go to the home of [the mother] to obtain a note so that she could obtain medical treatment for [W.S.] At that time [W.S.] was in the car in front of his mother’s home and his mother did not go out to the car to speak to him, to check on him or to have any contact with him whatsoever. At this time he had been away from his mother without her having seen or talked with her son for over six weeks. At no time since December 25, 2002, has [the mother] called to personally speak to [W.S.] She did not attend any of the sporting events which he participated in since he left her home. She has made virtually no effort to have any contact with [W.S.] A similar situation has occurred with his father, [D.S.]
[[Image here]]
“When [W.S.] came to live with [G.A.B. and W.G.B.] he was struggling with his school work, this was in his first grade year of school.... When he began school he could not write his name, he did not know his ABC’s; and he had poor verbal skills.... The evidence is clear and unrefuted that there has been a remarkable change in [W.S.] subsequent to his beginning to live on a full time basis with [G.A.B. and W.G.B.] His grades in school have improved and he is a child that is happy, full of life and well rounded. Not only has his academics improved but he now participates in sports.... The Court had the opportunity to meet with [W.S.] in chambers and found him to be a bright, well rounded child who expressed a clear and unequivocal desire to remain in the care, custody, and control of [G.A.B. and W.G.B.], to whom he refers as ‘Mom’ and ‘Dad.’ [G.A.B. and W.G.B.] have provided the only stable home life to which this child has ever known and the Court is of the opinion that to remove this child from the home would create detriment to the child that would be irreversible.
“The home life that [W.S.] currently experiences with [G.A.B. and W.G.B.] is a far cry from what he has described on occasion of what his home life was like with his mother ... and father. He described a home life where police frequently came to the home; where his stomach hurt because he was hungry; where he was told he was stupid; where he observed his parents smoking illegal drugs.... He described a home where there was not enough food to eat; where he observed acts of sex, and where he was punished in a most unusual manner where he was required to hold a glass *1095 full of water in front of him with his arms extended and if he dropped any of the water he would be whipped.”
The trial court also stated that there was evidence indicating that physical abuse continued to occur in the mother’s home and that neither the mother nor Tr.D. had been gainfully employed during the time that the case had been pending. In fact, according to Tr.D.’s aunt, Tr.D. had admitted to her that he had lied to DHR about his employment status as part of his successful attempt to regain custody of T.D. The trial court further remarked that the mother was not a credible witness and that she was an unfit parent. The trial court concluded that the mother and D.S. had abandoned W.S. for over one year, that W.S. was a dependent child, and that custody of W.S. should remain with G.A.B. and W.G.B. The trial court also denied the mother and D.S. any visitation with W.S. because such would be “adverse to the best interest and stability of [W.S.] ”; it entered a restraining order against the mother stating that she was not to contact, threaten, or harass G.A.B., W.G.B., W.S., or any witness in the case; and it “invited” any interested party to file a petition to terminate the mother’s and D.S.’s parental rights. The trial court also stated that had a termination-of-parental-rights petition been filed, it would have granted the petition based on the evidence presented at the August 2004 hearing.
The mother filed two contemporaneous postjudgment motions to the August 2004 judgment: one requesting that the trial court alter, amend, or vacate its judgment and one requesting that the trial court grant her a new trial. The trial court denied the motions. The mother appeals (our case no. 2031140).

I. The Appeal in Case No. 2031 HO

The mother first contends that the trial court’s pre-hearing ex parte “order of April 8, 2003, was an invalid order and should be declared ‘void ab initio’ by the court and allow the parties to return to the status quo.” She also contends that the post-hearing order was also an ex parte order that should be declared void ab ini-tio.
We first note that the April 2003 post-hearing order was entered while the trial court still had jurisdiction to correct any defects in the pre-hearing order. See Rule 1(B), Ala. R. Juv. P. The record would support findings that the post-hearing order was entered after the mother received notice of G.A.B. and W.G.B .’s petition for custody of W.S., that the mother was aware that G.A.B. and W.G.B. were receiving custody of W.S. at the April 2003 hearing, that the mother did not object to the hearing or deny the allegations contained in either DHR’s petition or G.A.B. and W.G.B.’s petition at the hearing, and that the post-hearing order was entered in conjunction with the April 2003 hearing. “If a party contends that there was improper procedure at a hearing, that party must have brought it to the attention of the trial court either by an objection made at the hearing or by a proper and timely posttrial motion for such a contention to be properly considered on appeal.” Niver v. State Dep’t of Human Res., 521 So.2d 1326, 1328 (Ala.Civ.App.1987); see also Ex parte Linnell, 484 So.2d 455 (Ala.1986); and Embroy v. State Dep’t of Pensions & Sec., 450 So.2d 127 (Ala.Civ.App.1984).
Moreover, the trial court’s April 8, 2003, custody order has since been supplanted by the court’s August 24, 2004, order awarding custody of W.S. to G.A.B. and W.G.B. Thus, G.A.B. and W.G.B. maintained custody of W.S. pursuant to the April 8, 2003, order only during the period from April 8, 2003, to August 24, 2004. No relief ordered by this court can change the fact that G.A.B. and W.G.B. had custody of *1096 W.S. during that period. Accordingly, to the extent the mother seeks relief from the April 2003 order, her appeal is moot.
The mother next contends that the trial court’s August 2004 order is due to be reversed because, she says, its determination that she was “unfit” to have custody of W.S. was not supported by legal and clear and convincing evidence. In her counter-petition for custody, the mother alleged that W.S. was a dependent child, and the trial court utilized the standards applicable in a dependency proceeding when it issued the August 2004 order denying her coun-terpetition. See Ala.Code 1975, § 12-15-65. We have carefully reviewed the record and conclude that the trial court’s judgment as to the mother’s “fitness” to obtain custody of W.S. in this dependency proceeding is amply supported by both legal and clear and convincing evidence. This evidence includes ample evidence indicating that the mother had abandoned W.S., as well as evidence concerning illegal drug activity, domestic violence, absences of W.S. from school, verbal and physical abuse of W.S., exposure of W.S. to sex acts, and the employment history of the mother and Tr.D. In addition, substantial evidence supported the trial court’s finding that W.S. had, during certain periods, been “neglected, ill-fed [and] ill-clothed” while in the custody of the mother. Further still, the trial court had ample evidence from which it could have made adverse credibility determinations as to testimony given by both the mother and Tr.D.
Also, the trial court conducted an “in camera” interview with W.S. without objection by any party. No transcript of the interview was made or requested. This court repeatedly has held that where there was evidence before the trial court, but not before the appellate court, that may have influenced the trial court, we will assume that it did so and that it supported the trial court’s conclusion. E.g., Jennings v. Jennings, 892 So.2d 437, 439 (Ala.Civ.App.2004) (quoting Eaton v. Shene, 282 Ala. 429, 430, 212 So.2d 596, 598 (1968)).
The mother next contends that the trial court erred by denying the guardian ad litem’s motion for visitation. The mother’s appellate brief contains numerous references to factual matters the she asserts are pertinent to our review of the visitation issue, yet she includes no citations to the record and a single citation to authority that merely stands for the general proposition that a trial court is to consider the best interest of the child in determining visitation. See Rule 28(a)(10), Ala. R.App. P.; see also Rule 2(a)(2)(D), Ala. R.App. P. Nonetheless, we have carefully reviewed the record and have concluded that the trial court’s determination that it was in W.S.’s best interest not to have visitation with the mother is supported by substantial evidence.
The trial court’s August 2004 order denying the mother’s counterpetition for custody of W.S. and denying the guardian ad litem’s motion for visitation is due to be affirmed.

II. The Appeal in Case No. 20J0019

There was no indication before the commencement of the August 2004 trial on the mother’s counterpetition for custody of W.S. that custody of A.S., T.D., and N.G.D. might be at issue in that trial. Nonetheless, after the mother “rested” as to her case-in-chief seeking custody of W.S., substantial evidence was introduced that led the trial court to conclude not only that W.S. would be at risk by being in the mother’s custody but that A.S., T.D., and N.G.D. also would be at risk by being in the mother’s custody (and, as to T.D. and N.G.D., by being in Tr.D.’s custody). The nature of this evidence is referenced in the foregoing discussion concerning the custo *1097 dy of W.S. The evidence included testimony from Tr.D.’s aunt, who testified that Tr.D. had admitted to her that he had deceived DHR in an attempt to obtain custody of T.D.; from police officer Tim Thomas, who testified that the mother and Tr.D. had numerous complaints of drug sales, drug possession, and drug use against them, that they were currently under criminal investigation, and that domestic violence had been reported between Tr.D. and the mother as recently as June 2004; and from A.S.’s school teacher, Vicki Howard, who testified that A.S. had confided in her after school began regarding serious problems in his home environment, including child abuse allegedly committed by Tr.D. and indications that drugs were present in the home. Howard stated that A.S. began school approximately one week before trial and that she had contacted DHR on the day before the trial regarding the information that A.S. had provided to her.
On September 7, 2004, the trial court entered a written order, ex mero motu, as to A.S., T.D., and N.G.D. The September 2004 order stated that at the August 2004 trial as to custody of W.S. the trial court had heard evidence indicating that DHR had been deceived by the mother and Tr. D.; had received sworn testimony as to domestic violence, abuse, drug use, and other matters involving Tr.D. and the mother; and had heard evidence indicating that A.S., T.D., and N.G.D. were at risk of “immediate harm and danger if left in the home of [Tr.D.] and [the mother].” The trial court concluded that the children were dependent, it awarded custody of the children to DHR, and it recommended that DHR proceed with termination of parental rights. The trial court denied Tr.D., the mother, and D.S. any right of visitation with the children, and it entered a restraining order against them.
The mother filed a postjudgment motion in the cases involving A.S., T.D., and N.G.D.; the trial court denied her motion. The mother appeals. She contends that the trial court erred by entering the September 2004 order without first conducting a hearing and that the trial court erred by not conducting a 72-hour hearing and providing her with an “opportunity to be heard” as to A.S., T.D., and N.G.D.[7]
As of July 2004, A.S., T.D., and N.G.D. were in the mother’s custody. Both Ala. Code 1975, § 12 — 15—60(a) (governing cases where a child has been taken into custody based on the allegations contained in a dependency petition or where a child has been taken into custody by a law-enforcement officer, probation officer, or DHR representative, see Ala.Code 1975, § 12-15-56), and Ala.Code 1975, § 12-15-153 (governing cases where a court has entered “a protection or restraint order on an emergency basis, without prior notice and hearing, upon a showing of verified written or oral evidence of abuse or neglect injurious to the health or safety of the child and the likelihood that such abuse or neglect will continue unless the order is issued”), require a trial court to hold a 72-hour hearing when a child is summarily removed from parental custody. In fact, DHR concedes in its appellate brief that this court should remand the cause for further proceedings.[8]
*1098 Based on our review of the record, including the oral testimony the trial court heard at the August 2004 trial, we conclude that the trial court did not err by entering the September 2004 order removing A.S., T.D., and N.G.D. from the mother’s custody without prior notice to the mother. The court had heard sworn testimony that would support either a finding (1) that the children might be “in immediate danger from [their] surroundings ... [and that] removal from such surroundings [was] necessary for the protection of the health and safety of such child[ren],” see § 12-15-56(8); see also Worley v. Jinks, 361 So.2d 1082 (Ala.Civ.App.1978), or (2) that an emergency protection and restraint order as described in § 12-15-153 was necessary to protect the children from abuse or neglect. As noted, however, both § 12-15-60(a) and § 12-15-153 require a trial court to hold a 72-hour hearing after the entry of an order removing a child from parental custody.[9] The trial court erred in not setting the cases for a 72-hour hearing after it entered the September 2004 order.
We reverse the trial court’s order insofar as it denied the mother’s request for a 72-hour hearing, and we remand the cause for the trial court to conduct a hearing in regard to the issue of the mother’s right to custody of A.S., T.D., and N.G.D. and to conduct such other proceedings as may be required, or as the court may deem appropriate, under the Rules of Juvenile Procedure and applicable statutes.

III. The Appeal in Case No. 204.0013

After the entry of the September 2004 order, Tr.D. filed a timely postjudgment motion as to the case involving T.D. Although Tr.D. contends otherwise in his brief on appeal, the record does not reflect that Tr.D. filed a postjudgment motion as to N.G.D. Nonetheless, on September 20, 2004, the mother filed a timely post-judgment motion in the case involving N.G.D., thus suspending the running of the time for filing a notice of appeal for both her and Tr.D. until the denial of her post-judgment motion on September 23, 2004. See New Addition Club, Inc. v. Vaughn, 903 So.2d 68, 71-72 (Ala.2004); Rule 4(a)(3), Ala. R.App. P. After the denial of the mother’s postjudgment motion, the mother timely filed her notice of appeal as to N.G.D. on October 6, 2004; Tr.D. timely filed his notice of appeal on October 7, 2004.
Tr.D. contends that the trial court erred by denying his request for a 72-hour hearing as to the custody of T.D. and N.G.D.[10] *1099 As discussed above, the trial court did not err by entering the September 2004 order as to custody of T.D. and N.G.D., but it did err by not holding a 72-hour hearing. Accordingly, we hereby reverse the trial court’s order insofar as it denied Tr.D.’s request for a 72-hour hearing, and we remand the cause for the trial court to conduct a hearing in regard to Tr.D.’s rights to custody of T.D. and N.G.D. and to conduct such other proceedings as may be required, or that the trial court may deem appropriate, under the Rules of Juvenile Procedure and applicable statutes.
2031140 — AFFIRMED.
2040019 and 2040043 — REVERSED AND REMANDED.
CRAWLEY, P.J., and THOMPSON, PITTMAN, and BRYAN, JJ., concur.

. D.S. and the mother also had a daughter, K.Sa., who was approximately 10 years old at the time of trial. Pursuant to a court order entered in October 2001, K.Sa. had been in the custody of her paternal grandmother for approximately three years at the time of the August 2004 trial in this case. Custody of K.Sa. is not at issue.

. The charges were apparently later dismissed.

. A.S. and W.S. had been the subject of truancy petitions in 2001 (JU-01-489.01 and JU-01-490.01, respectively). Those petitions were disposed of in 2001 after the trial court lectured the parties.

.The order specifically references G.A.B. and W.G.B.'s petition and the supporting affidavits. It is unclear why the trial court granted the petition prior to the 72-hour hearing.

. The record does not reflect that the trial court was involved in the institution of the safety plan for A.S., W.S., and T.D.

. Based on the case action summary sheet, an order bearing case number JU-01-490.02 was apparently filed at 2:25 p.m. in both case number JU-01-490.02 and case number JU-01-490.03.

. The mother's appellate brief contains sub-arguments that are not supported by citations to controlling legal authority and that were not presented to the trial court in her post-judgment motion; it also contains allegations as to matters that are contrary to the record. We will not address those arguments. See Rule 28(a)(10), Ala. R.App. P.; see also Crutcher v. Wendy's of North Alabama, Inc., 857 So.2d 82, 97 (Ala.2003).

. In light of the evidence that was presented regarding the parties alleged deceit in obtain *1098 ing custody of T.D. and A.S. from DHR, the trial court could have, ex mero motu, raised the issue of fraud in the procurement of the June 2004 order returning custody of T.D. to the mother and Tr.D. and the July 2004 order returning custody of A.S. to the mother. See Ex parte Waldrop, 395 So.2d 62 (1981); and Harrison v. Harrison, 404 So.2d 330, 332-333 (Ala.1980). However, due process would require the trial court to provide the mother and Tr.D. with notice and an opportunity to be heard before the orders were "set aside.”

. The hearing required under § 12-15-60(a) must be "held within 72 hours, Saturdays, Sundays and holidays included”; the hearing required under § 12-15-153 "must be held within 72 hours or the next judicial business day thereafter.”

. DHR correctly notes that on appeal as to N.G.D. the record contains no request for a 72-hour hearing by Tr.D. because he filed no timely postjudgment motion in N.G.D.'s case. In other words, as to custody of N.G.D., Tr.D. is raising the issue of the trial court's failure to conduct a 72-hour hearing for the first time on appeal. See Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala.1992); see also M.R. v. State Dep’t of Human Res., 587 So.2d 416 (Ala.Civ.App.1991) (holding that even constitutional issues cannot be raised for the first time on appeal). However, under the peculiar facts of this case, and particularly in light of our reversal of the September 2004 *1099 order denying the mother's right to a 72-hour hearing as to N.G.D., we conclude that in the case involving N.G.D. "the ends of justice necessitate” the reversal of the judgment as to Tr.D. also. See Bush v. James T. Johnson & Co., 411 So.2d 139, 142 (Ala.Civ.App.1982).